AO 106 (Rev. 04/010) Application for Search Warrant    AUTHORIZED AND APPROVED/DATE: *Allison Christian* 2/24/23

# UNITED STATES DISTRICT COURT
## for the
WESTERN    DISTRICT OF    OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| 103 S. 4th AVE., STROUD, Oklahoma 74079 | ) Case No:    M-23- 91 -SM |
| WITH ACCESS AND CONTROL OF ALL | ) |
| OUTBUILDINGS, VEHICLES, CURTILAGE, | ) |
| AND DIGITAL DEVICES | ) |

### APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property *(identify the person or describe property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference.

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim.P.41(c) is *(check one or more)*:
- ☒ evidence of the crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a), (e) | Production of, and attempted production of, with intent to view child pornography |

The application is based on these facts:

See attached Affidavit of Special Agent Orlando A. Brown II, Federal Bureau of Investigation , which is incorporated by reference herein.

- ☒ Continued on the attached sheet(s).
- ☐ Delayed notice of [No. of Days]  days *(give exact ending date if more than 30 days)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

*SA Orlando A. Brown II*
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date:    February 23, 2023

*Judge's signature*

City and State:    Oklahoma City, Oklahoma    SUZANNE MITCHELL, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Orlando A. Brown II, Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 103 S. 4th Avenue, Stroud, Oklahoma 74079, (hereinafter the "SUBJECT PREMISES") further described in Attachment A, for the items described in Attachment B.

2.      I have been employed as a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") since September 2015, and I am currently assigned to the Oklahoma City Division. Since joining the FBI, I have been involved in investigations of child exploitation matters and computer crimes against children. I am currently assigned to investigate violations of federal law involving the exploitation of children. I have gained expertise in conducting such investigations through in-person trainings, classes, and everyday work in my current role as an SA with the FBI.

3.      The information contained in this Affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and review of documents and records. This Affidavit is made in support of an application for a warrant to search the entire premises located at the SUBJECT PREMISES, which is described in detail in Attachment A to this Affidavit,

including the residential dwelling, vehicles, curtilage, any persons located on said property, and any computer (as broadly defined in 18 U.S.C. § 1030(e)(1)) or other digital file storage device located there, for the items specified in Attachment B hereto, which constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. § 2251(a) and (e).

4.      Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## STATEMENT OF FACTS AND PROBABLE CAUSE

5.      On August 2, 2022, Jessica Starr ("Starr") called the FBI National Threat Operations Center ("NTOC") to report allegations of Child Sexual Abuse Material stored on a SD Card created by PATRICK PARRICK ("PARRICK").

6.      On August 3, 2022, Agents telephonically interviewed Starr about the criminal complaint to NTOC. Starr stated the Lincoln County District Attorney's Office in Chandler, Oklahoma, was in possession of a SD Card that contained pictures and/or videos of one of her minor children. Starr informed Agents about a separate incident that occurred

2

on July 17, 2022. On that date, Glendon Hightower ("Glendon") confronted PARRICK about pictures of Glendon's children being on a second SD Card (the "Micro-SD Card").[1]

7.    On August 5, 2022, Starr was interviewed by Agents at the Oklahoma City FBI Office. Starr stated in 2017, while Starr was living with PARRICK at 17 Hilcrest Drive, Stroud, Oklahoma (the "Hilcrest Residence"), the Hilcrest Residence was burglarized and a camera with an SD Card was stolen by Johnathan Roggencamp ("Roggencamp"). Roggencamp was trying to sell the camera to Stephanie Cole-Bernal, Starr's cousin, who saw a video of Starr's minor child getting out of the shower on the camera. Roggencamp, attempting to be a good Samaritan, went and placed the SD card on the window of Detective Jimmie Ahrend's (with the Stroud Police Department) squad car. The Stroud Police Department turned over the SD Card to the Lincoln County District Attorney's Office, which reviewed the SD Card and determined it was blank.

8.    On September 26, 2022, Starr was interviewed by Agents in the FBI, Oklahoma City Field Office after receiving still images from Kimberly Hightower ("Kimberly") that were taken by PARRICK. Starr told Agents that PARRICK was seen in one of the images looking at the camera. Starr informed Agents that PARRICK was

---

[1] Agents determined the second SD Card mentioned by Starr is the Micro-SD Card, and it will be referred to as the "Micro-SD Card" throughout this Affidavit.

utilizing a device to capture images of several children getting in and out of the shower in a bathroom. Starr identified the parents of the children as Glendon and Kimberly. During the interview, Starr showed Agents still images (described below) that she received from Kimberly via Facebook. On the date of this interview, Starr was unable to tell Agents the exact residence where the images were taken. Starr signed a letter of consent to allow Agents to extract the contents of her phone. Below is a description of the images found on Starr's phone.

 a. Image 1 – appears to be a picture of PARRICK identified by Starr

 b. Image 2 – appears to be a picture of a prepubescent naked girl pulling the shower curtain back, exposing her bare chest and vagina

 c. Image 3 – appears to be a picture of a prepubescent boy in the shower exposing his chest

 d. Image 4 – appears to be a young female fully clothed standing in the bathroom

 e. Image 5 – appears to be a closer picture of the young female in Image 4

 f. Image 6 – appears to be a closer picture of the prepubescent boy in Image 3

 g. Image 7 – appears to be a closer picture of the young female in Image 4

h. Image 8 – appears to be the same prepubescent girl in Image 2 exposing her face as she pulls back the shower curtain

9.     A few days later, on September 28, 2022, Kimberly was interviewed by Agents at her residence, 1521 N. Highway 99, Lot 24, Stroud, Oklahoma, about PARRICK and the images she sent to Starr. Kimberly informed Agents that she received the images from Jacob Cullum via Facebook while her phone was in the possession of OSBI and Lincoln County Sheriff's Office. Her phone was in the possession of Lincoln County Sheriff's Office because they were investigating the disappearance of PARRICK on July 17, 2022.[2] Upon OSBI and Lincoln County Sheriff's Office returning the phone to Kimberly, Starr contacted Kimberly to retrieve the images for Starr to show to Agents.

10.     Kimberly identified the children on the images as Minor 1, Minor 2, and Minor 3.

11.     Kimberly signed a letter of consent to allow Agents to extract the contents of her phone. On September 28, 2022, extraction of the phone was unsuccessful. On September 29, 2022, Agents received another signed letter of consent from Kimberly to

_____

[2] Parrick disappeared for a couple of days after a physical altercation between Parrick and Glendon. Kimberly and Glendon are no longer married, but they had exchanged messages about their children and Parrick. As such, Lincoln County Sherriff's Office confiscated her phone while investigating the altercation and Parrick's subsequent disappearance.

extract the contents of her phone. The extraction was successful, but the images identified in the interview were not captured during the extraction.

12.    On October 3, 2022, Jacob Cullum ("Cullum") was interviewed by Agents regarding PARRICK and the images sent to Kimberly. Cullum informed Agents that he became aware of the videos after he found the Micro-SD Card at Glendon's residence located at 920043 S. 3580 Road, Stroud, Oklahoma ("Glendon's Residence"). Cullum saw the Micro-SD Card while he was visiting Glendon's Residence. The next day, Cullum went back to Glendon's Residence and saw the same Micro-SD card on the ground outside. Cullum took the Micro-SD Card with him. Utilizing a device, Cullum was able to listen to the audio of the Micro-SD Card and heard what appeared to be children. Later, Cullum, utilizing a laptop, downloaded an application to see and hear the contents of the video. Cullum observed a video of PARRICK touching himself and children getting in and out of the shower. Cullum then used his iPhone to take pictures and videos of the video on the Micro-SD Card to show Kimberly and Glendon. Cullum sent some of the images to Kimberly and returned the Micro-SD Card to Glendon. Cullum retrieved his phone from his residence at 101 E 2nd Street, Stroud, Oklahoma, and signed a letter of consent to allow Agents to extract the contents of his phone.

13.    Agents reviewed the contents of the extraction and observed 20 videos and 59 images pertaining to the incident. Below is a description of two (2) of the videos:

    a. Video labeled IMG_1476 displayed PARRICK setting up the camera and cleaning out the shower. PARRICK was wearing red shorts; no shirt and a tattoo can be seen on his left shoulder. The date 06/1/2019 is displayed in the lower left corner of the video in yellow.

    b. Video labeled IMG_1478 depicts a girl entering the bathroom fully clothed wearing blue pants and a light blue shirt. Shortly after, the girl begins to get undressed and turns on the shower. The girl goes off screen then comes back and continues to get undressed, exposing her bare chest, vagina, and buttocks. Later in the video, the girl gets into the shower closing the shower curtain.

14. On October 7, 2022, Glendon was interviewed outside of Glendon's Residence about the Micro-SD Card and his relationship with PARRICK. Glendon informed Agents that he was first made aware of the images and video when his ex-wife, Kimberly, called and told him. Later, Cullum brought the Micro-SD Card to Glendon for him to view the images and videos.

15. Glendon informed Agents a few years back that he lost power at his residence and went to PARRICK's residence (227 S. 5th Avenue, Stroud, Oklahoma) for him and his children to shower.

16.     Glendon described the video as depicting PARRICK setting up the camera and hiding it under the sink. Glendon stated PARRICK was video recording himself while he was setting up the camera. Glendon stated the video on the Micro-SD Card shows his children go in the bathroom to take their showers. Glendon is unaware as to what else is on the Micro-SD Card. Glendon signed a letter of consent and gave the Micro-SD Card to the Agents.

17.     Jessica Starr told me PARRICK lived at 227 S. 5th Avenue, Stroud, Oklahoma. She said he bounced between that residence and Glendon's Residence. I determined both residences are in Lincoln County in the Western District of Oklahoma. I believe the videos in question were taken at the 227 S. 5th Avenue address because Glendon told me he used to take showers at the residence when he lost power at his residence, and his children would sometimes go with him, thereby giving PARRICK an opportunity to arrange a camera in the bathroom and video-record the children.

18.     On October 20, 2022, United States Magistrate Judge Shon T. Erwin authorized a search of a Micro-SD Card belonging to PARRICK.

19.     On October 21, 2022, I extracted the SD Card and reviewed the contents. I selected 11 videos of evidentiary value. I observed the following:

      a. MOV00001: depicts a video of PARRICK adjusting a device position to capture the shower. PARRICK is shirtless looking directly at the

camera. Shortly after PARRICK stands up wearing red shorts and left the screen. The shower curtain is decorated with a blue pattern. Later, PARRICK returned with cleaning supplies. PARRICK placed several items near the device.

b. MOV00002: depicts a video of PARRICK placing another bottle of cleaning products next to the device. During this time, PARRICK adjusts the camera and removes the items blocking the view. PARRICK is seen cleaning the shower. Right before the video ends, PARRICK is kneeling down with his face being displayed on the camera while placing a yellow rag over the device looking directly into the camera.

c. MOV00003: depicts a video of PARRICK's face while he is adjusting the camera placing it on racks. Once PARRICK is finished adjusting the camera, PARRICK stands up, places a phone in his pocket, and walks off from camera view. Shortly after PARRICK comes back, he places another item over the device and continues to adjust the device.

d. MOV00004: depicts a video of a minor entering the bathroom fully clothed with a backpack. The minor sits a backpack on the floor and takes their clothes out of the backpack. The minor leaves the view of

9

the camera then returns and takes off their clothes exposing their vagina,

buttocks and breast.

20.    On November 1, 2022, Starr contacted me and stated that PARRICK

currently resides at the SUBJECT PREMISES.

21.    A search of a public records database shows Lincoln County District Court

in the State of Oklahoma issued a marriage license on November 9, 2022, to PARRICK

and Sandra Louise Juarez ("Juarez"). A search of public records database indicated

Juarez's driver license displays the address of 103 S. 4th Avenue, Stroud, Oklahoma, 74079,

which is the SUBJECT PREMISES.

22.    On November 21, 2022, law enforcement installed a pole camera to view the

public areas of the SUBJECT PREMISES.

23.    Utilizing the pole camera, I reviewed the SUBJECT PREMISES on

December 15, 2022. At approximately 12:39 p.m., a black Dodge Challenger arrived at the

SUBJECT PREMISES. PARRICK exited the vehicle and entered the SUBJECT

PREMISES using a key. At approximately 12:48 p.m., the same white adult male exited

the SUBJECT PREMISES wearing a long sleeve grey and black shirt, blue jeans, and

baseball cap and walked out of the pole camera view.

24.    On December 15, 2022, at approximately 1:52 p.m., I observed PARRICK

exit the Lincoln County Clerk's Office with an unidentified female ("UF") and unidentified

10

male. PARRICK and the UF entered a Black GMC Sierra and drove to Walmart in Stroud, Oklahoma. PARRICK was wearing a long sleeve grey and black shirt, blue jeans, and a baseball cap that match the male in the surveillance footage from the SUBJECT PREMISES.

25.     Utilizing the pole camera, from November 22, 2022, through February 8, 2023, the black Dodge Challenger has been parked at the SUBJECT PREMISES overnight and PARRICK has been seen entering and exiting the premises. Juarez and PARRICK are the only individuals who have been seen spending the night consistently at the SUBJECT PREMISES.

26.     A search of a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, and other information was conducted for PARRICK. This public record indicated PARRICK's current address is 103 S 4th Ave, Stroud, Oklahoma—which is the SUBJECT PREMISES.

27.     Based on the information detailed in this affidavit, I believe PARRICK, who is associated with the following address in Stroud, Oklahoma: 103 S. 4TH AVE, STROUD OKLAHOMA, 74079, likely displays characteristics common to individuals who access with intent to view and/or produce, possess, or receive child pornography and evidence of these crimes is located at the premises.

11

28.    As set forth more fully herein, given child pornography collectors' tendency to keep and maintain their child pornography for long periods of time, computers' technological abilities to indefinitely store huge quantities of child pornography and evidence of accessing it, and the high probability that PARRICK would not have left his child pornography at his previous residence (227 S. 5th Avenue, Stroud, Oklahoma) or at Glendon's residence for subsequent occupants to discover, I believe there is sufficient probable cause to believe PARRICK took his devices containing child pornography and/or child pornography—and hidden cameras to produce child pornography—with him to his new address (the SUBJECT PREMISES) and they are located in the SUBJECT PREMISES.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS
## BIOMETRIC ACCESS TO DEVICE(S)

29.    This warrant permits law enforcement agents to obtain from PARRICK (and not other persons located at the SUBJECT PREMISES) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s) (specifically including tablets and cellular phones) subject to search and seizure pursuant to this warrant. The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this

13

feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

14

e.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.  As discussed in this Affidavit, I have reason to believe that one or more tablets or cellular phones belonging to PARRICK will be found during the search.  The passcode or password that would unlock such tablets or cellular phones subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.  As discussed in this Affidavit, I have reason to believe that one or more laptops reasonably associated with PARRICK will be found during the search.  The passcode or password that would unlock such laptops subject to search under this warrant currently is not known to law enforcement.  Thus,

law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

h.  I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

16

i. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require PARRICK, who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

j. Due to the foregoing, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant would permit law enforcement personnel to obtain from PARRICK the display of any physical

biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of PARRICK to the fingerprint scanner of the device(s) found at the SUBJECT PREMISES; (2) hold the device(s) found at the SUBJECT PREMISES in front of the face of PARRICK to activate the facial recognition feature; and/or (3) hold the device(s) found at the SUBJECT PREMISES in front of the face of PARRICK to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

k.   The proposed warrant does not request authority for nor authorize law enforcement to compel any person other than PARRICK to state or otherwise provide the password for, or to identify which specific biometric characteristics (including the unique finger(s) or other physical features) may be used to unlock or access any device(s). However, during the execution of the requested warrant, law enforcement agents may seek to obtain such information voluntarily from persons present at the SUBJECT PREMISES.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

30.   I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a.  Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images.

b.  The development of computers has changed this; computers serve four basic functions in connection with child pornography: production, communication, and storage.

c.  Child pornographers can now transfer photographs from a camera onto a computer readable format with a device known as a scanner. With the advent of digital cameras, the images can be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

d.  The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The storage capability of the

electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously over the years. These drives can store hundreds of thousands of images at a very high resolution.

e.  The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.  Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo!, Microsoft, and Google, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer.

g.  As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained

20

unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or Internet Service Provider client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner can often recover evidence which shows that a computer contains peer to peer software, when the computer was sharing files, and even some of the files which were uploaded or downloaded. Such information may be maintained indefinitely until overwritten by other data.

h. Smartphones are a class of mobile phones with multi-purpose mobile operating systems with central processing units, similar to processing units in computers. A mobile operating system is an operating system for phones, tablets, smartwatches, or other mobile devises. Mobile operating systems combine features of a personal computer operating system with other features useful for mobile or handheld use, including but not limited to a touchscreen, cellular capabilities, Bluetooth, Wi-Fi access, Global Positioning System mobile navigation, video-frame and single-frame picture cameras.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

31.    Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to child pornography collectors:

a. Most individuals who collect child pornography are sexually attracted to children, their sexual arousal patterns and erotic imagery focus, in part or in whole, on children. The collection may be exclusively dedicated to children of a particular age/gender or it may be more diverse, representing a variety of sexual preferences, including children. Child pornography collectors express their attraction to children through the collection of sexually explicit materials involving children as well as other seemingly innocuous material related to children.

b. These individuals may derive sexual gratification from actual physical contact with children as well as from fantasy involving the use of pictures or other visual depictions of children or from literature describing sexual contact with children. The overriding motivation for the collection of child pornography may be to define, fuel, and validate the collector's most cherished sexual fantasies involving children.

22

c. Visual depictions may range from fully clothed depictions of children engaged in non-sexual activity to nude or partially nude depictions of children engaged in explicit sexual activity. In addition to child pornography, these individuals are also highly likely to collect other paraphernalia related to their sexual interest in children. This other material is sometimes referred to as "child erotica" which is defined as any material, relating to children, that serves a sexual purpose for a given individual. It is broader and more encompassing, than child pornography, but at the same time the possession of such corroborative material, depending on the context in which it is found, may be behaviorally consistent with the offender's orientation toward children and indicative of his intent. It includes things such as fantasy writings, letters, diaries, books, sexual aids, souvenirs, toys, costumes, drawings, cartoons and non-sexually explicit visual images.

d. Child pornography collectors reinforce their fantasies, often by taking progressive, overt steps aimed at turning the fantasy into reality in some or all of the following ways: collecting and organizing their child-related material; masturbating while viewing the child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and

23

indirectly, with other like-minded adults through membership in organizations catering to their sexual preference for children thereby providing a sense of acceptance and validation within a community; gravitating to employment, activities and/or relationships which provide access or proximity to children; and frequently persisting in the criminal conduct even when they have reason to believe the conduct has come to the attention of law enforcement. These are need-driven behaviors to which the offender is willing to devote considerable time, money, and energy in spite of risks and contrary to self-interest.

e. Child pornography collectors almost always maintain and possess their material in the privacy and security of their homes or some other secure location where it is readily available. The collection may include sexually explicit or suggestive materials involving children, such as photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images, or other visual media. The collector is aroused while viewing the collection and, acting on that arousal, he often masturbates, thereby fueling and reinforcing his attraction to children. This is most easily accomplished in the privacy of his own home.

24

Because the collection reveals the otherwise private sexual desires and intent of the collector and represents his most cherished sexual fantasies, the collector may not dispose of the collection. The collection may be culled and refined over time, but the size of the collection tends to increase. Individuals who use a collection in the seduction of children or to document that seduction treat the materials as prized possessions and are especially unlikely to part with them. Even if a child pornography collector does delete files from his hard drive or other electronic media, a computer expert can still retrieve those files using forensic tools.

f. **I believe that someone who took the risk and went to the effort to surreptitiously produce child pornography in a bathroom using hidden cameras would be unlikely to leave the child pornography and the cameras used to produce it in an old residence upon moving. I believe it's probable that he would have taken such items with him to the new residence—the SUBJECT PREMISES. Further, I believe that computers were probably involved with the production of the aforementioned child pornography because cameras can connect to computers. Photos can be moved from a camera to a computer. Photos can also be moved from a computer to a thumb drive or other external storage device. A computer forensic analyst can often recover images,**

25

**including the movement of such images as described above, on a**
**computer after the fact.**

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

As described above and in Attachment B, this Application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of PARRICK'S electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

32.     *Probable cause.*  I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not

actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

27

33.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

28

b.    As explained herein, information stored within a computer and other electronic storage media may provide evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation. In my training and experience, information stored within a computer or storage media can provide evidence as to who may have used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed without permission of the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the

29

physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is, or is not, present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to obtain child pornography over the Internet, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime

31

of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

34.    *Necessity of seizing entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. Seizing computers or storage media is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on

the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Subject Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

35.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not

limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.

36. It is possible that the SUBJECT PREMISES will contain storage media that are perhaps owned by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be reasonably associated with PARRICK found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

37. Based on Lincoln County Assessor map, the SUBJECT PREMISES is located in the Western District of Oklahoma.

## CONCLUSION

38. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A. Therefore, I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the search and seizure of the items described in Attachment B.

39. I am aware that the recovery of data by a computer forensic analyst takes significant time (much the way recovery of narcotics must later be forensically evaluated

34

in a lab). Digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the SUBJECT PREMISES. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Orlando A. Brown II
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on February 23, 2023:

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE

35

## <u>ATTACHMENT A</u>

*Description of Locations to be Searched*

1.    **<u>The premises to be searched is 103 S 4th Ave, Stroud, Oklahoma, 74079</u>**.

     The entire property located at 103 S. 4th Ave, Stroud, Oklahoma 74079, includes a single-story residence, any outbuildings, an unattached carport and any appurtenances thereto (the "SUBJECT PREMISES"). The residence has tan colored siding with white trim. The unattached single carport has a white awning. The numbers "103" are affixed to a white post on the front of the residence. The roof of the residence has grey shingles. The back of the residence is surrounded by a chain-link fence.

2.    **<u>Photographs of the SUBJECT PREMISES</u>**







# ATTACHMENT B

*Property to be Seized*

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § 2251(a) and (e):

1. Computers or storage media reasonably associated with PARRICK used as a means to commit the violations described above.

2. For any computer or storage medium reasonably associated with PARRICK whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

4

e.      evidence indicating the computer user's state of mind as it relates to the crime(s) under investigation;

f.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.      evidence of the times the COMPUTER was used;

i.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.      records of or information about Internet Protocol addresses used by the COMPUTER;

l.      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.      contextual information necessary to understand the evidence described in this attachment.

3.      Routers, modems, and network equipment used to connect computers to the Internet.

4.      Child pornography, as defined in 18 U.S.C. § 2256(8) and child erotica.

5.      Records, information, and items relating to violations of the statutes described above including:

5

a.    Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES, including utility and telephone bills, mail envelopes, or addressed correspondence;

b.    Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes; and

c.    Records and information relating to the identity or location of the persons suspected of violating the statutes described above.

d.    Records and information relating to the sexual exploitation of children, including correspondence and communications between users of cloud storage providers;

e.    Records and information showing access to and/or use of cloud storage providers.

6. Any cameras, including hidden cameras and evidence of dominion and control of any such camera.

During the execution of the search of the SUBJECT PREMISES described in Attachment A, law enforcement personnel are authorized to compel PARRICK to (1) press or swipe his fingers (including thumbs) to a fingerprint scanner of a device reasonably associated with PARRICK found at the SUBJECT PREMISES; and/or (2) hold a device reasonably associated with PARRICK found at the SUBJECT PREMISES in front of the face of PARRICK, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical

form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro-SD cards, macro SD cards, CD/DVDs, gaming systems, SIM cards, cellular phones capable of storage, memory cards, memory chips, and other magnetic or optical media.